Reuben D. Nathan, Esq. (SBN 208436)
Email:  *rnathan@nathanlawpractice.com*
NATHAN & ASSOCIATES, APC
2901 West Pacific Coast Highway, Suite 350
Newport Beach, California 92663
Tel:(949) 270-2798
Facsimile:(949) 209-0303

Attorneys for Plaintiff
Michael Santini and the Proposed Class

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SANTINI, an individual on behalf of himself and all others similarly situated and the general public,<br><br>              Plaintiff<br>    v.<br><br>NESTLÈ USA, INC.; and DOES 1 through 10, inclusive,<br><br>          Defendant. | Case No.<br><br>**CLASS ACTION   COMPLAINT**<br><br><br><br><br><br>JURY TRIAL DEMANDED |

1

**CLASS ACTION COMPLAINT**

COMES NOW PLAINTIFF, MICHAEL SANTINI, WHO HEREBY ALLEGES THE FOLLOWING:

Plaintiff, MICHAEL SANTINI ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant, NESTLÈ USA, INC. ("Defendant" or "NESTLÈ")

The allegations in this Complaint, stated on information and belief, have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## NATURE OF ACTION

1.     Plaintiff files this class action lawsuit on behalf of himself and all similarly situated persons who purchased NESTLÈ (as defined below).

2.     Plaintiff brings this action on behalf of himself and a California Nationwide proposed class of purchasers of the NESTLÈ Products (i.e. any NESQUIK product that contains the "NO ARTIFICAL FLAVORS OR COLORS" on the front packaging of the NESQUIK products) for violations of the California Consumer Legal Remedies Act, the California False Advertising Law, the California Unfair Competition Law, breach of express warranty, breach of the implied warranty of merchantability and for fraud and negligent misrepresentation.

## PARTIES

3.     Plaintiff, Michael Santini ("Plaintiff "), is a citizen of California, who resides in the county of San Francisco, California.

4.     Plaintiff has purchased NESTLÈ products from 2018 to 2019 in store locations in San Francisco and local areas nearby to San Francisco and thereby altered his position in an amount equal to the amount he paid for the Defendant' NESTLÈ Products.

**CLASS ACTION COMPLAINT**

Plaintiff and the Proposed Class would not have purchased or paid a premium for the NESTLÈ products had they known that the products contain artificial or synthetic flavors or colors, which claims were/are false, deceptive and misleading.

5.      Plaintiff saw and read the front of the product packaging and relied on the representations, statements, and warranties "NO ARTIFICAL FLAVORS OR COLORS" to mean the Products were 'natural' and did not contain synthetic and/or artificial ingredients or undergo a chemical process that changes the composition from its "natural" state, in the amount, type and/or form which a reasonable consumer would not expect based on the representations on the front of the packaging.

6.      Plaintiff and class members read the labeling on the front of the NESTLÈ Products, relying on the statements such as "NO ARTIFICAL FLAVORS OR COLORS" prior to making purchase.  Plaintiff purchased one or more of the DEFENDANT'S Products at a premium price and would not have made the purchase had she known the labeling was false, deceptive, and/or misleading.

7.      Defendant, NESTLÈ USA, INC., ("NESTLÈ" or "Defendant") is a Delaware corporation with its headquarters in Arlington, Virginia. In 1948, NESTLÈ launched a drink mix for chocolate-flavored milk called NESTLÈ QUIK in the United States, which was released in Europe during the 1950's as NESQUIK. NESQUIK itself is a brand of products.

8.      The NESTLÈ products that are the subject of this action include: any NESQUIK product that contains the "NO ARTIFICAL FLAVORS OR COLORS" on the front packaging of the NESQUIK products (hereinafter the "Products"). The Products are available in different containers representing different sizes. The NESTLÈ Products are manufactured, packaged, marketed, distributed and sold by the Defendant via supermarket chains and retail stores throughout the United States.

**CLASS ACTION COMPLAINT**

9.     The NESTLÈ Products contain false, deceptive and misleading claims regarding "NO ARTIFICAL FLAVORS OR COLORS" related claims that are the subject of the instant lawsuit. Defendant created and/or authorized the false, misleading, and deceptive advertisements and/or packaging and labeling for the NESTLÈ Products that falsely claim they contain no artificial flavoring or coloring.

10.     That the true names and capacities, whether individual, corporate, associate or otherwise of each of the Defendant designated herein as a DOE are unknown to Plaintiff at this time, who therefore, sue said Defendant by fictitious names, and will ask leave of this Court for permission to amend this Complaint to show their names and capacities when the same have been ascertained.  Plaintiff is informed and believes and thereon alleges that each of the Defendant designated as a DOE is legally responsible in some manner for the events and happenings herein referred to, and caused injuries and damages thereby to these Plaintiffs as alleged herein.

11.     On information and belief, Plaintiff alleges that at all times herein mentioned, each of the Defendants were acting as the agent, servant or employee of the other Defendant and that during the times and places of the incident in question, Defendant and each of their agents, servants, and employees became liable to Plaintiff and class members for the reasons described in the complaint herein, and thereby proximately caused Plaintiff to sustain damages as set forth herein.

12.     On information and belief, Plaintiff alleges that Defendant carried out a joint scheme with a common business plan and policies in all respects pertinent hereto and that all acts and omissions herein complained of were performed in knowing cooperation with each other.

13.     On information and belief, Plaintiff alleges that the shareholders, executive officers, managers, and supervisors of the Defendant directed, authorized, ratified and/or

**CLASS ACTION COMPLAINT**

participated in the actions, omissions and other conduct that gives rise to the claims asserted herein. Defendant's officers, directors, and high-level employees caused NESTLÈ Products to be sold with knowledge or reckless disregard that the statements and representations concerning the NESTLÈ Products were false and misleading.

14.     Plaintiff is informed and believes, and thereon alleges, that each Defendant, is in some manner intentionally, negligently, or otherwise responsible for the acts, omissions, occurrences, and transactions alleged herein.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction according to 28 U.S.C. § 1332(d), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs and most members of the proposed class are citizens of states different from Defendant.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

16.     Plaintiff is a citizen of California and this Court has personal jurisdiction over Defendant because Defendant conducts business in California and otherwise intentionally avail themselves of the markets in California so as to render the exercise of jurisdiction by this Court proper. Defendant has marketed, promoted, distributed, and sold the NESTLÈ Products in California and in this District, which is where Plaintiff purchased Defendant's products.

17.     Pursuant to 28 U.S.C. §1391(b), this Court is the proper venue since the Defendant is subject to personal jurisdiction in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

//

//

**CLASS ACTION COMPLAINT**

## INTRODUCTION

18.   The Products' representations are misleading because despite the front-label claims of "NO ARTIFICAL FLAVORS OR COLORS" the ingredients have been processed to change the flavoring and coloring OR the ingredients undergo a chemical process that changes the composition from its natural state, in the amount, type and/or form which a reasonable consumer would not expect based on the claims asserted on the front of the packaging of the Products.

19.   The "NO ARTIFICAL FLAVORS OR COLORS" representative is deceptive, misleading and false because the cocoa has been processed and modified, as explained below and disclosed only on the ingredient list, in violation of Food and Drug Administration ("FDA") regulations[1] meant to combat this type of consumer deception.

### I. Consumer Demand for Minimally Processed Yet Indulgent Ingredients

//

//

---

[1]  Section 201(f) of the Federal Drug & Cosmetic Act ("FD&C Act") defines the term "food" to mean articles for food or drink for man or other animals, chewing gum, and articles used for components of any such article.  Subject to certain exceptions, dietary supplements are generally considered to be foods under the FD&C Act (21 U.S.C. 321(ff)). Section 201(n) of the FD&C Act (21 U.S.C. 321(n)) provides that labeling is misleading if, among other things, it fails to reveal facts that are material in light of representations made or suggested in the labeling, or material with respect to consequences that may result from the use of the food to which the labeling relates under the conditions of use prescribed in the labeling, or under such conditions of use are customary or usual. Section 201(m) of the FD&C Act defines "labeling" as all labels and other written, printed, or graphic matter upon any article or any of its containers or wrappers or accompanying such article. The Food and Drug Administration ("FDA") considers the term "natural" to mean that nothing artificial or synthetic  (including all color additives regardless of source) has been included in, or has been added to, a food. 21 CFR Part 101 [Docket No. FDA–2014–N–1207]: Use of the Term ''Natural'' in the Labeling of Human Food Products.

## CLASS ACTION COMPLAINT

20.   According to a trade publication, "[M]ore consumers are looking for authenticity and 'real' ingredients in their foods, including sweet ingredients like real sugar" and cocoa.[2]

21.   And survey data compiled by the International Dairy-Deli-Bakery Association (IDDBA) shows a growing "number of Americans continue to avoid products made with processed or artificial ingredients."

22.   Approximately two-thirds of consumers "noted that health, nutrition and making better choices are factors in their purchasing decisions on indulgent items or desserts," and "[H]alf of shoppers look for 'real' ingredients."[3]

23.   Another recent study found "nearly three-quarters of U.S. consumers find it important to recognize the ingredients in the products they buy,"[4] confirming that "recognition of ingredients to be one of the biggest drivers of product choice, with more than half of respondents (52 percent) considering it to be an important factor."[5]

24.   This is not to say a reasonable consumer expects confections and sweets to be healthy or nutrient-rich – they are by definition an indulgence and not consumed for

---

[2] Beth Day, Indulgence driving innovation in baked foods, November 3, 2016 FoodBusinessNews.net, https://www.foodbusinessnews.net/articles/7110-indulgence-driving-innovation-in-baked-foods
[3] Progressive Grocer, Bakery Connects Emotionally With Consumers, Drives Grocery Sales, April 8, 2019, https://progressivegrocer.com/bakery-connects-emotionally-consumers-drives-grocery-sales
[4] https://www.snackandbakery.com/articles/88762-clean-label-snacks-and-bakery-move-from-novelty-to-mainstream
[5]   https://www.foodinsiderjournal.com/clean-label/75-consumers-will-pay-extra-clean-label-ingredients

7

**CLASS ACTION COMPLAINT**

their salutary effects in the same way other foods might be.

25.     But consumers expect and seek out those indulgent foods that let them enjoy a "guilty pleasure" while taking comfort in other attributes of those products.[6]  The fact that a product may be a confection or sweet does not eradicate the reasonable consumer's expectation the product labels' contain true and accurate representations.

26.     The representation "NO ARTIFICAL FLAVORS OR COLORS" is false, deceptive and misleading because consumers expect that Product to contain a higher quality than ingredients that have been artificially or synthetically processed.

27.     Consumers' preference for minimally processed foods and ingredients has caused companies to implement advertising schemes.[7]

28.     Generally, consumers' ability to interpret nutrition label information is poor, so prominent labels -- especially those prominently featured on the front packaging -- are particularly important to consumers.[8]

29.     NMI highlighted consumers' attitudes and behaviors toward a wide array of

---

[6]Monica Watrous, The new pleasure paradigm, Food Business News, Oct. 4, 2017, https://www.foodbusinessnews.net/articles/10688-the-new-pleasure-paradigm ("To tap into today's pleasure principles, it is critical to move beyond the temporary "high" often associated with pleasure and focus on real ingredients").
[7] Berning JP, Chouinard HH, Manning KC, McCluskey JJ, Sprott DE. Identifying consumer preferences for nutrition information on grocery store shelf labels. Food Policy 2010;35(5):429–36.
[8]  Lisa M. Soederberg Miller; Diana L. Cassady, The Effects of Nutrition Knowledge of Food Label Use: A Review of the Literature. 2015 Sep.; 92:207-216.; and Marietta AB, Welshimer KJ,  Anderson SL. Knowledge, attitudes, and behaviors of college students regarding the 1990 Nutrition Labeling Education Act food labels. J Am Diet Assoc 1999; 99(4):445–9.

**CLASS ACTION COMPLAINT**

issues related to trends in foods and beverage usage.

30.     These insights, gleaned from an annual, nationally representative sample of more than 3,000 adults, provided an understanding of the attitudes, motivations and behaviors.

31.     More than three-quarters of consumers report package labels influence their purchases.

32.     According to Nielsen market research, a majority of consumers "say that when it comes to ingredient trends, a back-to-basics mind-set, focused on simple ingredients and fewer artificial or processed foods, is a priority."[9]

33.     Consumers have certain expectations based on experience when it comes to how representations are declared on a label, because ingredients such as cocoa are a commonly used and valued product amongst U.S. households.

34.     In fact, chocolate accounts for the largest percentage of the $34.5 billion dollar U.S. confectionary industry, which is approximately 60% or an estimated $21.1 billion in sales according to the National Confectioners Association.[10]

35.     A study conducted by Label Insight surveyed more than 1,500 consumers to

---

[9] Reaching for Real Ingredients: Avoiding the Artificial, Nielsen, CPG, FMCG & Retail, Sept. 6, 2016 https://www.nielsen.com/us/en/insights/news/2016/reaching-for-real-ingredients-avoiding-the-artificial.html
[10] National Confectioners Association, https://www.franchisehelp.com/industry-reports/chocolate-industry-analysis-2018-cost-trends/ (https://www.candyusa.com) (last visited October 9, 2019)

**CLASS ACTION COMPLAINT**

determine what they expect from brands when it comes to product information.

36.     The survey results indicate that the vast majority of consumers value product transparency and consider a wide array of information about a particular product before making purchase decisions.

37.     Sixty-seven percent (67%) of consumers believe it is the brand or manufacturer's responsibility to provide them with complete product information.

38.     Consumers expect brands to provide complete and accurate information about the product.

39.     Ninety-four percent (94%) of consumers say that they want manufacturers to be transparent about the actual ingredients in food and how it is made.

40.     The study found that consumers lack access to the complete set of information they're looking for in order to make informed purchase decisions when shopping for groceries.

41.     Even when the information is provided, they don't fully understand what it means due to inconsistency, information overload and misinformation.[11]

## II.     Background – What is Cocoa?

---

[11] https://www.labelinsight.com/hubfs/Label_Insight-Food-Revolution-Study.pdf?hsCtaTracking=fc71fa82-7e0b-4b05-b2b4-de1ade992d33%7C95a8befc-d0cc-4b8b-8102-529d937eb427

**CLASS ACTION COMPLAINT**

42.     The word "cocoa" is actually derived from the Spanish word "cacao," which is derived from the Nahuatl word cacahuatl.[12]

43.     The cocoa bean, which is also called the cacao bean or cacao is the dried and fully fermented seed of Theobroma cacao, from which cocoa solids[13] (a mixture of nonfat substances) and cocoa butter (the fat) are usually extracted.

44.     Cocoa beans form the basis of cocoa powder and chocolate.

45.     Cocoa powder is an unsweetened powder produced by grinding the seeds of the fruit of a tropical evergreen tree called the cacao, or cocoa tree.[14]

46.     The cacao tree produces fruit, which contains a cocoa pod. Each cocoa pod contains approximately 30-50 beans.

47.     The beans are removed from the pod, fermented, and dried. The cocoa beans are cracked and the shells are separated from nibs.

48.     The nibs are roasted to a rich brown color and ground into chocolate liquid called cocoa liquor.

49.     The liquid solidifies after cooling and cocoa butter is extracted.

50.     The solid blocks that remain are pressed to produce cocoa powder.

---

[12] Bingham, Ann; Roberts, Jeremy (2010). South and Meso-American Mythology A to Z. Infobase Publishing. p. 19. ISBN 978-1-4381-2958-7.
[13] Taylor CL, Wilkening VL. How the nutrition food label was developed, part 1: the Nutrition Facts panel. J Am Diet Assoc 2008;108(3):437–42
[14] https://www.thespruceeats.com/what-is-cocoa-powder-520351

**CLASS ACTION COMPLAINT**

51.     Cocoa powder ("cocoa") is the "core of a chocolate's flavor, without any extra fat, sugar, or milk to get in the way."

52.     Cocoa powder results from crushing the edible portions of the cocoa bean – "nibs" – into a fine paste, releasing and melting the nibs' fat content (cocoa butter).

53.     The combination of crushed, ground nibs and cocoa butter produces chocolate liquor.

54.     The chocolate liquor is pressed between hydraulic plates to form hard-cocoa "press cakes" and the excess cocoa butter is removed.

55.     The cocoa cakes are grated into fine powders.

56.     The types of powders produced are based on the amount of cocoa butter, or fat, remaining in the powder: high or "breakfast cocoa" (22% +), medium or "cocoa" (10-12%) and low-fat cocoa (less than 10%).

III.     **Effects of Alkali Treatment on Cocoa**

57.     Cocoa powder can be further treated through alkalization ("Dutch-process" or alkalized) or used in its non-alkalized state

58.     Unsweetened cocoa powder is typically rendered in two forms – unalkalized cocoa, or Dutch-process/alkalized cocoa.

59.     Unalkalized cocoa results from pressing cocoa beans with no additional

**CLASS ACTION COMPLAINT**

modifications.

60.     The resulting natural cocoa powder is light brown, with a strong chocolate taste and a fruitiness.

61.     "Dutch" cocoa powders have been treated with alkali solutions to raise the pH (to make it less acidic).

62.     Alkalization creates a range of **darker brown colors**, giving the impression they contain more cocoa than they actually do but substituting a **mild taste from a more intense chocolate-y taste**.

**Non-Alkalized**        **Alkalized**



**CLASS ACTION COMPLAINT**

**Non-Alkalized**



63.     Alkalization detracts from the real cocoa taste delivering a milder flavor.

**IV.     Unmodified and Unalkalized Cocoa Provides Benefits**

64.     The health benefits associated with cocoa are widely accepted.[15] The health
benefits of "cocoa" are so important to consumers that it is often the topic of discussion

---

[15] Cocoa and dark chocolate increasingly have been associated with cardiovascular health benefits.
These include increasing vasodilation (12) and coronary arterial output (13) as well as decreasing blood
pressure (14, 15) and platelet aggregation (16). These combined effects, along with epidemiological
studies that show lowering of blood pressure (17) and decreases in mortality due to cardiovascular
disease (17, 18), suggest that cocoa powder and dark chocolate are associated with heart and circulatory
benefits. These benefits are thought to be conferred, in part, by the flavanol antioxidants found in cocoa.
*Impact of Alkalization on the Antioxidant and Flavanol Content of Commercial Cocoa Powders*,
Kenneth B. Miller, at al. J. Agric. Food Chem. 2008, 56, 8527–8533 8527.

**CLASS ACTION COMPLAINT**

1    in public forums, promoted by well-known doctors, such as Dr. Oz.[16]

2         65.    Cocoa and dark chocolate increasingly have been associated with

3    cardiovascular health benefits.

4

5         66.    It is generally known that cocoa powder's health benefits include a high

6    amount of flavanols and fiber.

7         67.    Cocoa is a food ingredient that is important for the contribution of flavor to

8    foods and it clearly has associated with health benefits.

9

10        68.    Flavanol (flavan-3-ol) antioxidants14 are responsible for cardiovascular

11   health benefits. It is a well-known fact that natural cocoas are high in flavanols.

12

13        69.    Flavonoids are a class of antioxidants that are abundant in both cacao and

14   cocoa powder.

15        70.    Flavonoids inhibit pro-inflammatory enzymes in the body, meaning that they

16
17   have a widespread anti-inflammatory effect.

18        71.    Additionally, flavonoids have been associated with higher levels of

19
20   "healthy" HDL cholesterol and better overall cardiovascular health.

21        72.    In a study, the results showed that natural cocoas tend to group with the

22   highest total flavanols ranging from 22.86 to 40.25 mg/g.

23
24        73.    The lightly alkali processed cocoa powders ranged from 8.76 to 24.65 mg/g

25   _____
     [16] https://www.doctoroz.com/article/good-chocolate-bad-chocolate-and-how-tell-difference (last visited
26   October 9, 2019)

15

27   **CLASS ACTION COMPLAINT**

28

total flavanols, the medium alkali treated powders from 3.93 to 14.00 mg/g, and the heavily alkali treated powders from 1.33 to 6.05 mg/g total flavanols.

74.    Natural cocoas showed the highest levels of ORAC and TP. Both antioxidant capacity and TP were highly negatively correlated with pH15.

75.    Natural (nonalkalized powders) have the highest ORAC, total polyphenols ("TP")[17] and flavanols (including procyanidins).

76.    When cocoa is processed with alkali, also known as Dutch processing or Dutching, the flavanols and TP's are substantially reduced.[18]

77.    Approximately, 40% of the natural level of flavanols is retained on average for lightly Dutched powders and an average of about 22% is retained in medium alkali treated powders.

78.    Alkali treatment substantially reduces the level of flavanols in cocoa powders, negatively impacts the health benefits, which represents an important processing step during which losses can occur."[19]

---

[17] Singleton, V.; Rossi J. Colorimetry of total polyphenols with phosphomolybdic-phosphotungstic scoid reagents. *Am. J. Enol. Vitic.* 1965, 16, 144-58.

[18] Gu, L.; Kelm, M.; Hammerstone, J. F.; Beecher, G.; Cunningham, D.; Vannozzi, D.; Prior, R. Fractionation of polymeric procyandins from low-bush blueberry and quantification of procyandins in selected foods with an optimized normal phase HPLC-MS fluorescence detection method. *J. Agric. Food Chem.* 2002, *50*, 4852–4860; Kolbe, F. X. A study of natural and alkali process cocoa powders *Manuf. Confect.* 1964, May, 31-34.

[19] Miller et al., Impact of alkalization on the antioxidant and the flavanol content of commercial cocoa powders. J Argic Food Chem 56:8527-33 (2008).

**CLASS ACTION COMPLAINT**

79.     In addition to its antioxidant properties attributed from flavanols, there are additional scientifically proven health benefits associated with unprocessed cocoa that is directly derived from the seed of the cocoa tree.

80.     Studies show that cocoa and dark chocolate will improve health by lowering your risk of heart disease.

81.     Cocoa and dark chocolate is also nutritious, because the fatty acid profile of the cocoa is excellent and it contains stimulants such as caffeine.

82.     These cocoa beans can also improve your blood flow and blood pressure, while raising HDL and protecting LDL from oxidation.

83.     Unprocessed cocoa also contains bioactive compounds to protect against sun damage.[20]

## V.     Non-Alkalized Cocoa Powders Exist and are Viable Alternatives

84.     Cocoa manufacturers are aware of many consumers' desires to eschew additives when consuming cocoa powder.

85.     According to the trade publication BakeryandSnacks.com,

//

//

---

[20] https://www.healthline.com/nutrition/7-health-benefits-dark-chocolate#section7

**CLASS ACTION COMPLAINT**

Over the past few years, food manufactures have listened to customer demands for fewer additives in desserts. However, the 180-year-old process of alkalizing chocolate meant manufacturers could not label a product purely as "cocoa," instead having to use "cocoa processed with alkali."[21]

86.    Cocoa processors have responded to this demand by developing cocoa powder that achieves the dark brown color and intense chocolate flavor, but without the use of alkalis.

87.    For instance, a joint venture of Archers Daniel Midland ("ADM") and Belgian cocoa processing firm deZaan developed Truedark, a non-alkalized, cocoa powder with a "strong cocoa taste and a rich brown color."[22]

88.    The world's largest cocoa processor, Barry Callebaut, recently introduced "Natural Dark," "a cocoa powder that not only delivers a natural dark brown color but brings a rich, chocolaty flavor that [its] customers can confidently use across all major applications."[23]

## FACTUAL BACKGROUND

89.    Plaintiff has purchased the NESTLÈ Products from 2018 through 2019 from locations in San Francisco County and surrounding areas.  Plaintiff's preference for natural products containing no artificial flavors or colors is similar to other consumers seeking the benefits of products that do not contain artificial and/or synthetic ingredients,

---

[21] Hal Conick, ADM deZaan claims 'industry first' natural dark cocoa powder, Bakeryandsnacks.com, July 21, 2015.

[22] Archer Daniels Midland Company, Press Release, deZaan Introduces Dark Natural Cocoa Powder, 'Truedark,' Perishable News, Aug. 27, 2015.

[23] Anna Wiber, Bensdorp rolls out clean label cocoa powder, BakingBusiness.com, Aug. 30, 2019.

**CLASS ACTION COMPLAINT**

which is why the Plaintiff has been willing to pay a higher premium price for the NESTLÈ Products.  The average price for NESTLÈ Products varies from approximately $3 to $10 depending on the size of the container.  Plaintiff and class members purchased and paid a premium therefore in reliance on such statements as "NO ARTIFICAL FLAVORS OR COLORS" believing that the NESTLÈ Products contained no artificial and/or synthetic ingredients or did not undergo an artificial or synthetic process to produce an ingredient that was not natural.

90.    The Defendant's "NO ARTIFICAL FLAVORS OR COLORS" are printed on labels affixed to the NESTLÈ' Products located throughout retail stores throughout America.  At all times, Plaintiff believed that he was purchasing products containing "NO ARTIFICAL FLAVORS OR COLORS" when purchasing the NESTLÈ' Products.  In fact, Plaintiff continued to purchase the NESTLÈ' Products believing them to not contain "NO ARTIFICAL FLAVORS OR COLORS" or did not undergo an artificial or synthetic process to produce an ingredient that was not natural.  Defendant continued to maintain that its Products contain no artificial or synthetic flavors or colors.

91.    Defendant manufactures, distributes, and/or produces a variety of products including NESQUIK. Defendant claims that the NESTLÈ Products contain "NO ARTIFICAL FLAVORS OR COLORS." The "NO ARTIFICAL FLAVORS OR COLORS" made by the Defendant regarding the NESTLÈ Products are false, misleading and deceptive. The NESTLÈ Products cost more than other similar products that do have misleading labeling setting forth false claims.  If the Defendant was enjoined from making the false representations, the market demand and price for the NESTLÈ Products would be reduced insofar as the market prices have been artificially inflated as a result of the Defendant's false claims "NO ARTIFICAL FLAVORS OR COLORS". Plaintiff and class members expected that any labeling from Defendant to be truthful and honest.  Prior to

**CLASS ACTION COMPLAINT**

making any purchase, Plaintiff and class members read the label prominently displayed by Defendant that the NESTLÈ Products did not contain artificial flavors or colors since processing cocoa with alkali produces an artificial color and flavor.  Plaintiff and class members on the basis of Defendant's labeling did not expect there to be any artificial and/or synthetic flavoring or coloring in the Products.

92.     Defendant admits on the back of the packaging that they use "COCOA PROCESSED WITH ALKALI" in the NESTLÈ' Products.

93.     The Defendant prominently displays claims that the NESTLÈ Products contain "NO ARTIFICAL FLAVORS OR COLORS" on the labels affixed to the products. Plaintiff saw and read similar labels prominently displayed on the NESTLÈ Products at stores located in San Francisco county and surrounding areas with the language "NO ARTIFICAL FLAVORS OR COLORS," which Plaintiff relied on in deciding to purchase NESTLÈ Products.

94.     The following images show an example of the front label of the packaging containing the representations, "NO ARTIFICAL FLAVORS OR COLORS":

//

//

**CLASS ACTION COMPLAINT**



95.    The following images show an example of the back label of the packaging containing the statement "COCOA PROCESSED WITH ALKALI":

**CLASS ACTION COMPLAINT**

96.     The Defendant prominently display claims that the NESTLÈ Products contain "NO ARTIFICAL FLAVORS OR COLORS" per the labels affixed to the front packaging of the Products. Plaintiff saw and read similar labels prominently displayed on the NESTLÈ Products at stores located in San Francisco County and surrounding areas with the language "NO ARTIFICAL FLAVORS OR COLORS", which Plaintiff relied on in deciding to purchase NESTLÈ Products.

97.     At all times, Plaintiff and class members believed that the NESTLÈ Products did not contain artificial flavors or colors based on the representations and/or warranties and concluded there were no artificial and/or synthetic ingredients or processes impacting flavor or color that were present in the Products.

98.     By the Defendant's own admissions, the NESTLÈ Products undergo a synthetic process affecting and impacting the color and flavor. Alkalized cocoa is chemically processed to reduce the acidity and harshness of natural cocoa. In doing so,

**CLASS ACTION COMPLAINT**

alkalizing alters the flavor of the cocoa and darkens the color, making it appear to be even more chocolate in taste. Cocoa processed with alkali undergoes an artificial or synthetic process that is contrary to the representations contained on the Defendant's labels. Insofar as the Defendant makes very specific representations that the NESTLÈ Products contain "NO ARTIFICAL FLAVORS OR COLORS"-- those representations are false, deceptive and misleading.

## PRIVATE ATTORNEYS GENERAL ALLEGATIONS

99.    In addition to asserting class claims, Plaintiff assert claims on behalf of class members pursuant to *California Business & Professions Code § 17200, et seq.*  The purpose of such claims is to obtain injunctive orders regarding the false labeling, deceptive marketing and consistent pattern and practice of falsely promoting natural claims relating to flavors and colors and the disgorgement of all profits and/or restoration of monies wrongfully obtained through the Defendant's pattern of unfair and deceptive business practices as alleged herein.  This private attorneys general action is necessary and appropriate because Defendant has engaged in wrongful acts described herein as part of the regular practice of its business.

## CLASS ACTION ALLEGATIONS

100.   Plaintiff brings this action on his own behalf and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.

101.   Plaintiff seeks to represent the following Class and Sub-Class (hereinafter collectively the "Classes"):

> All persons residing in the United States who purchased the NESTLÈ Products for personal use and not for resale during the time period April 9, 2016, through the present (the "Class").

## CLASS ACTION COMPLAINT

All persons residing in the State of California who purchased the NESTLÈ Products for personal use and not for resale during the time period April 9, 2016, through the present (the "Sub-Class").

102.   The Classes comprise many thousands to millions of persons throughout the United States and California, the joinder of whom is impracticable, and the disposition of their claims in a class action will benefit the parties and the Court. The Classes are sufficiently numerous because on information and belief, thousands to hundreds of thousands of units of the NESTLÈ Products have been sold in the United States and State of California during the time period April 9, 2016, through the present (the "Class Period").

103.   There is a well-defined community of interest in this litigation and the Classes are easily ascertainable:

a. Numerosity:  The members of the Classes are so numerous that any form of joinder of all members would be unfeasible and impractical.  On information and belief, Plaintiff believes the size of the Classes exceed thousands of members.

b. Typicality:  Plaintiff is qualified to and will fairly and adequately protects the interests of each member of the Classes with whom he has a well-defined community of interest and the claims (or defenses, if any) are typical of all members of the Classes.

c. Adequacy:  Plaintiff does not have a conflict with the Classes and is qualified to and will fairly and adequately protect the interests of each member of the Classes with whom he has a well-defined community of interest and typicality of claims, as alleged herein.  Plaintiff acknowledges that he has an obligation to the Court to make known any relationship, conflict, or difference with any

**CLASS ACTION COMPLAINT**

putative class member.  Plaintiff's attorneys and proposed class counsel are well versed in the rules governing class action and complex litigation regarding discovery, certification, and settlement.

d. <u>Superiority</u>:  The nature of this action makes the use of class action adjudication superior to other methods.  Class action will achieve economies of time, effort, and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire class.

104.   There exist common questions of law and fact that predominate over questions that may affect individual class members. Common questions of law and fact include, but are not limited to, the following:

a. Whether Defendant' conduct is a fraudulent business act or practice within the meaning of Business and Professions Code section 17200, *et seq*.;

b. Whether Defendant' advertising is untrue or misleading within the meaning of Business and Professions Code section 17500, *et seq*.;

c. Whether Defendant made false and misleading representations in the advertising and/or packaging of the NESTLÈ Products;

d. Whether Defendant knew or should have known that the claims and representations were false;

e. Whether Defendant represented that the NESTLÈ Products have characteristics, benefits, uses, or quantities which they do not have;

f. Whether Defendant representations regarding the NESTLÈ Products are false;

g. Whether Defendant warranted the health and wellness of the NESTLÈ Products by virtue of the representations and warranties relating to the Products;

**CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

h.  Whether the Defendant breached warranties regarding the NESTLÈ Products;

i.  Whether the Defendant committed statutory and common law fraud; and

j.  Whether Defendant's conduct as alleged herein constitutes an unlawful business act or practice within the meaning of Business and Professions Code section 17200, *et seq*.;

105.   Plaintiff's claims are typical of the claims of the Classes, and Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained competent and experienced counsel in class action and other complex litigation.

106.   Plaintiff and the Classes have suffered injury in fact and have lost money as a result of Defendant's false representations.  Indeed, Plaintiff purchased the NESTLÈ Products under the belief that the Products did not contain artificial flavoring or coloring or the flavoring or coloring was not altered from its natural state. Plaintiff relied on Defendant's packaging, labeling, and marketing and would not have purchased the NESTLÈ Products or paid a premium for them if he had known that they did not have the characteristics, ingredients, uses, benefits, or quantities as represented vis-à-vis the representations and warranties relating to the Products.

107.   The Defendant's misrepresentations regarding the representations and warranties relating to the Products were material insofar as consumers relate the "NO ARTIFICAL FLAVORS OR COLORS" claims as indicative of healthier foods and tend to be willing to pay a price premium for healthier foods.  The Defendant is aware of consumer preference for healthier products and therefore have implemented a strategic false advertising and marketing campaign intended to deceive consumers into thinking that the NESTLÈ Products do not contain artificial colors or flavors even though the flavors and colors have been altered from its natural state.

**CLASS ACTION COMPLAINT**

108.   A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for class members to prosecute their claims individually.

109.   The trial and litigation of Plaintiff's claims are manageable. Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

110.   Defendant has acted on grounds generally applicable to the Classes as a whole, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Classes as a whole. The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant.

111.   Absent a class action, Defendant is likely to retain the benefits of their wrongdoing. Because of the small size of the individual class members' claims, few, if any, class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the class members will continue to suffer losses and Defendant will be allowed to continue these violations of law and to retain the proceeds of their ill-gotten gains.

112.   Excluded from the class is the Defendant in this action, any entity in which Defendant has a controlling interest, including, but not limited to officers, directors, shareholders, current employees and any and all legal representatives, heirs, successors, and assigns of Defendant.

**CLASS ACTION COMPLAINT**

113.   Were if not for this class action, most class members would find the cost associated with litigating claims extremely prohibitive, which would result in no remedy.

114.   This class action would serve to preserve judicial resources, the respective parties' resources, and present fewer issues with the overall management of claims, while at the same time ensuring a consistent result as to each class member.

## FIRST CAUSE OF ACTION

Violations of California Civil Code § 1750, *et seq.*

By Plaintiff and the Proposed Sub-Class against Defendant

115.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

116.   Plaintiff and the Sub-Class are "consumers" as defined by Cal. Civ. Code § 1761(d) and the NESTLÈ Products are each a "good" as defined by Cal. Civ. Code § 1761(a).

117.   The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), expressly prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  The Defendant has violated § 1770(a)(5) insofar as the Products alleged to contain no artificial flavoring or coloring constitute characteristics, ingredients and/or benefits that the NESTLÈ Products do not have.

118.   The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a) (7), expressly prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." The Defendant has violated § 1770(a)(7) insofar as the NESTLÈ Products are represented as not containing artificial flavoring or coloring i.e. natural flavors and colors which

28

**CLASS ACTION COMPLAINT**

constitutes a particular quality or grade, when in truth they contain artificial and synthetic ingredients or a chemical process that alters the color and flavor.

119.   The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(9), expressly prohibits "[a]dvertising goods or services with intent not to sell them as advertised."  The Defendant has violated § 1770(a)(9) insofar as the NESTLÈ Products have been advertised not containing artificial flavors or colors, but are not advertised or sold in a manner consistent with those claims.  Because the Defendant knows and have admitted that the NESTLÈ Products contain artificial or synthetic flavors or colors, the Defendant intended not to the sell the NESTLÈ Products as advertised, in violation of the CLRA.

120.   The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(16), expressly prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."  The Defendant has violated § 1770(a)(16) insofar as the Defendant has represented that the Plaintiff and Sub-Class have been supplied with Products with no artificial flavors or colors when they have not.

121.   Plaintiff and the proposed Sub-Class of California class members suffered injuries caused by Defendant because they would not have purchased the NESTLÈ Products if the true facts were known concerning the Defendant's false and misleading statements relating to its Products containing no artificial flavors or colors.

122.   On or about January 22, 2020, prior to filing this action, a notice letter was served on Defendant advising the Defendant that they are in violation of the CLRA and demanding remedies for Plaintiff and class members in accordance with Cal. Civ. Code 1782(a).  The notice is attached as "Exhibit A."

123.   Plaintiff seeks damages and injunctive relief for this violation of the CLRA

**CLASS ACTION COMPLAINT**

on behalf of himself and class members.

## SECOND CAUSE OF ACTION

Violations of California Business & Professions Code §§17500, *et seq.*

By Plaintiff and the Proposed Sub-Class against Defendant

124.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

125.   Pursuant to Cal. Bus. & Prof. Code §§ 17500, *et seq.*, it is "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

126.   Defendant committed acts of false advertising, as defined by §17500, by making representations that the Products contain no artificial flavors or colors, but those claims are false and misleading.

127.   Because the Defendant's product labeling admits the NESTLÈ Products contain artificial or synthetic ingredients, Defendant knew or should have known through the exercise of reasonable care that the claims regarding the NESTLÈ Products were false, untrue and misleading to Plaintiff and class members.

128.   Defendant's actions in violation of § 17500 were false and misleading such that the Plaintiff, the Proposed Sub-Class and the general public are and were likely to be deceived.

129.   Plaintiff and the Proposed Sub-Class lost money or property as a result of Defendant's false advertising violations, because they would not have purchased or paid

**CLASS ACTION COMPLAINT**

a premium for the NESTLÈ Products if they had not been deceived by Defendant's false claims.

129.   Plaintiff and the Proposed Sub-Class paid a premium for the NESTLÈ Products due to their reliance on the Defendant's claims and on the Defendant's good faith and reputation.

### THIRD CAUSE OF ACTION

For Breach of Express Warranty

Violations of Cal. Com. Code § 2313(1)

By Plaintiff and the Proposed Sub-Class against the Defendant

130.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

131.   Defendant made representations, promises and/or affirmations of fact constituting express warranties that the Products contain no artificial flavors or colors which are/were contained on the front of NESTLÈ Products. Defendant's statements, representations, and/or warranties formed a basis of the bargain on which the Plaintiff and the Proposed Sub-Class relied on in deciding to purchase and actually purchasing the NESTLÈ Products.  The warranties failed to comply with the affirmation that the NESTLÈ Products were natural since they contain artificial and/or synthetic flavors or colors.

132.   The Defendant breach the express warranties by selling the NESTLÈ Products in contravention of the express warranties insofar as the NESTLÈ Products contain artificial and/or synthetic flavors or colors.

133.   Defendant's breach of the express warranties were the actual and proximate cause of damage to the Plaintiff and the Proposed Sub-Class including, *inter alia*, the loss

**CLASS ACTION COMPLAINT**

of the purchase prices and/or the payment of a price premium in connection with their purchase of the NESTLÈ Products.

134.   Plaintiff provided written notice of breach to the Defendant, who failed to adequately respond or remedy the breach. The notice is attached to this complaint as "Exhibit A".

135.   Accordingly, Plaintiff and the Proposed Sub-Class seek actual damages arising from the Defendant' breach of express warranty.

<u>**FOURTH CAUSE OF ACTION**</u>

For Breach of the Implied Warranty of Merchantability

Violations of Cal. Com. Code § 2314

By Plaintiff and the Proposed Sub-Class against the Defendant

136.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

137.   Defendant made representations in the form of marketing and product labeling setting forth the All Natural Claims.  The Defendants are merchants that sold the NESTLÈ Products to Plaintiff and the Proposed Sub-Class, which carried with it an implied warranty that the NESTLÈ Products were merchantable.  Defendant made representations, promises and/or affirmations of fact constituting warranties that the Products contain no artificial flavors or colors which are/were contained on the front of NESTLÈ Products. Defendant's statements, representations, and/or warranties formed a basis of the bargain on which the Plaintiff and the Proposed Sub-Class relied on in deciding to purchase and actually purchasing the NESTLÈ Products.  The warranties failed to comply with the affirmation that the NESTLÈ Products contained artificial and/or synthetic flavors or colors.

**CLASS ACTION COMPLAINT**

138.   The Defendant breach the implied warranty in that the All Natural Claims regarding NESTLÈ Products were false.

139.   As an actual and proximate result of the Defendant's breach of implied warranty, Plaintiff and the Proposed Sub-Class did not receive the NESTLÈ Products in a manner that conformed to the promises and affirmations made on the labels thereof, in violation of Cal. Com. Code § 2314(2)(f).

140.   Plaintiff provided written notice of breach to the Defendant, who failed to adequately respond or remedy the breach. The notice is attached as "Exhibit A" to this complaint.

141.   Accordingly, Plaintiff and the Proposed Sub-Class seek actual damages arising from the Defendant's breach of implied warranty.

## FIFTH CAUSE OF ACTION

### For Fraud

### By Plaintiff and Proposed Class against Defendant

141.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

142.   Plaintiff brings this claim individually and on behalf of the Proposed Class against Defendant. At all times in purchasing NESTLÈ Products, Plaintiff and class members believed prior to making purchase that they were purchasing products that did not contain artificial and/or synthetic ingredients as a result of Defendant's labeling. From 2013, Plaintiff saw and read similar labels prominently displayed on the NESTLÈ Products at stores located in San Francisco and surrounding areas with the language "NO ARTIFICAL FLAVORS OR COLORS" which Plaintiff relied on in deciding to purchase NESTLÈ Products. Plaintiff and class members read Defendant's labeling on the front of

**CLASS ACTION COMPLAINT**

the NESTLÈ Products and paid a premium as a result of Defendant's statements, representations, and/or warranties.

143.   As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information in connection with the claims contained on the labeling of the NESTLÈ Products. Plaintiff and class members relied on Defendant's statements, representations, and warranties prior to making the decision to purchase the NESTLÈ' Products.  Defendant misrepresented and/or failed to disclose material facts to Plaintiff and class members about the NESTLÈ Products – that the NESTLÈ Products contained artificial and/or synthetic flavors or colors.

144.   Defendant misrepresented the nature and content of the NESTLÈ Products by making the false 'natural' related claims to the flavoring and coloring that Plaintiff and the class members relied on to their detriment.

145.   The Defendant's misrepresentations and omissions were made with knowledge of the falsehood thereof or in conscious disregard of the likelihood of their falsehood.

146.   The misrepresentations and/or omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and the Proposed Class members to purchase the NESTLÈ Products.

147.   The fraudulent actions of Defendant caused damage to Plaintiff and the Proposed Class members, who are entitled to damages, punitive damages, and other legal and equitable relief as a result.

//
//

**CLASS ACTION COMPLAINT**

**SIXTH CAUSE OF ACTION**

For Negligent Misrepresentation

By Plaintiff and Proposed Class against Defendant

148.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

149.   Plaintiff brings this claim individually and on behalf of the Proposed Class against Defendant. At all times in purchasing NESTLÈ Products, Plaintiff and class members believed prior to making purchase that they were purchasing products that did not contain artificial and/or synthetic ingredients as a result of Defendant's labeling. Plaintiff and class members read Defendant's labeling on the front of the NESTLÈ Products containing 'natural' related claims to flavoring and coloring and paid a premium as a result of Defendant's statements, representations, and/or warranties.

150.   Defendant misrepresented the nature, quality and ingredients of the NESTLÈ Products.  Defendant had a duty to disclose this information.

160.   At the time Defendant made the false representations as to the Products containing no artificial flavoring or coloring that Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

161.   Defendant negligently misrepresented and omitted material facts about the NESTLÈ Products, in that they were not 'natural' in flavoring or coloring and in fact contained artificial and/or synthetic flavoring or coloring.  Plaintiff and the Proposed Class relied upon the negligent statements or omissions and were deceived and induced into purchasing the NESTLÈ Products.

162.   The negligent misrepresentations and/or omissions made by Defendant, upon which Plaintiff and the Proposed Class members reasonably and justifiably relied,

**CLASS ACTION COMPLAINT**

were intended to induce and actually induced Plaintiff and the Proposed Class members to purchase the NESTLÈ Products.

163. Plaintiff and Class members would not have purchased the NESTLÈ Products and/or would not have paid a price premium therefore, if the true facts had been known to them regarding the falsity of the All Natural Claims.

164. The negligent actions of Defendant caused damage to Plaintiff and the Proposed Class members, who are entitled to damages and other legal and equitable relief as a result.

### SEVENTH CAUSE OF ACTION

For Violation Cal. Bus. & Prof. Code § 17200, *et seq*.

By Plaintiff and Proposed Sub-Class against Defendant

165. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

166. Plaintiff brings this claim individually and on behalf of the proposed Sub-Class against Defendant.

167. Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"). The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

168. Defendant knew and have known that the All Natural Claims are false, deceptive and misleading as a result of the inclusion of caramel color and beta-carotene in the NESTLÈ Products.

169. The foregoing acts and omissions by the Defendant constitute unfair, fraudulent business acts or practices and false advertising.

**CLASS ACTION COMPLAINT**

170.   As alleged hereinabove, the false, deceptive and misleading All Natural Claims by the Defendant are and were likely to deceive the Plaintiff, the Proposed Sub-Class, reasonable consumers and members of the general public and are therefore "fraudulent" within the meaning of the UCL.

171.   The foregoing violations of the Consumer Legal Remedies Act, the False Advertising Law and the California Commercial Code constitute "unlawful" business practices within the meaning of the UCL.

172.   Under the facts alleged hereinabove, the Defendant has also violated the FD&C Act [21 C.F.R. §§ 301, 321, 343(a)] and the California Sherman Food & Drug and Cosmetic Act [Cal. Health & Safety Code § 109875], both of which constitute unlawful business practices within the meaning of the UCL.

173.   Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.  The harm is substantial given the fact consumers are misled as to the nature of the NESTLÈ Products containing no artificial flavors or colors. Plaintiff and the Proposed Sub-Class have thereby been deceived and misled into unfairly paying premium prices.

174.   Defendant has specific knowledge that its natural claims are false and misleading, but continued to market the NESTLÈ Products with the intent of making substantial profits based on the unfair, fraudulent, deceptive practices alleged herein.

175.   The Defendant's conduct is also unfair given the huge profits derived from the sale of the NESTLÈ Products at the expense of consumers as a result of the false and misleading "NO ARTIFICAL FLAVORS OR COLORS" claims to the Products flavor or colors.

**CLASS ACTION COMPLAINT**

176.   Defendant violated the "fraudulent" prong of the UCL by making false statements, untruths, and misrepresentations about the NESTLÈ Products vis-à-vis the 'natural' related claims to the Products flavors or colors which are/were likely to deceive the Plaintiff, the Proposed Sub-Class, reasonable consumers and the general public.

177.   Plaintiff, the Class, and the Sub-Class lost money or property as a result of Defendant's UCL violations because they would not have purchased the NESTLÈ Products, would not have purchased the amount of NESTLÈ Products they purchased, and/or would not have paid the premium price they paid for the NESTLÈ Products if the true facts were known concerning the false and misleading "NO ARTIFICAL FLAVORS OR COLORS" claims.

178.   Defendant's business practices, as detailed above, are unethical, oppressive and unscrupulous, and they violate fundamental policies of this state.  Further, any justification for Defendant's wrongful conduct is outweighed by the adverse effects of such conduct.

179.   Plaintiff and the Sub-Class members could not reasonably avoid the harm caused by Defendant's wrongful practices. Assuming, arguendo, that Defendant's practices are/were not express violations of the laws set forth above, those practices fall within the penumbra of such laws and a finding of unfairness can properly be tethered to the public policies expressed therein. Thus, Defendant engaged in unfair business practices prohibited by California Business & Professions Code § 17200 et seq.

180.   Plaintiff, the Class, and the Sub-Class are entitled to restitution and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

**CLASS ACTION COMPLAINT**

a. For an order certifying the nationwide Class and the Sub-Class under Rule 23 of the Federal Rules of Civil Procedure;

b. For an order certifying Plaintiff as the representative of the Class and Sub-Class and Plaintiff's attorneys as Class Counsel to represent members of the Class and Sub-Class;

c. For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

d. For an order to correct, destroy, and change all false and misleading labeling and relating to the false and misleading claims;

e. For an order finding in favor of Plaintiff, the Class and the Sub-Class on all counts asserted herein;

f. For compensatory and punitive damages in amounts to be determined;

g. For prejudgment interest on all amounts awarded;

h. For an order of restitution, disgorgement of profits, and all other forms of equitable monetary relief;

i. For injunctive relief as pleaded restraining Defendant from disseminating false or misleading statements or as the Court may deem proper; and

j. For an order awarding Plaintiff, the Class, and the Sub-Class their reasonable attorneys' fees and expenses and costs of suit.

//
//

**CLASS ACTION COMPLAINT**

1

## DEMAND FOR TRIAL BY JURY

2

Plaintiff demands a trial by jury of all issues so triable.

3

Respectfully submitted,

4

Dated: April 7, 2020                    **NATHAN & ASSOCIATES, APC**

5

6                                   By:    */s/ Reuben D. Nathan*

7                                          Reuben D. Nathan, Esq.
                                           Attorneys for Plaintiff MICHAEL SANTINI

8                                          and the Proposed Classes

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**CLASS ACTION COMPLAINT**

28

# EXHIBIT A

**CLASS ACTION COMPLAINT**

# NATHAN & ASSOCIATES, APC

A PROFESSIONAL CORPORATION

2901 W. COAST, SUITE 200 • NEWPORT BEACH, CALIFORNIA 92663
TELEPHONE (949) 270-2798• FACSIMILE (949) 209-0303
EMAIL: RNATHAN@NATHANLAWPRACTICE.COM

January 22, 2020

NESTLÈ USA, INC.
1812 N. Moore Street
Arlington, VA 22209

**Re:   Notice of Violations of California Civil Code Sections 1782, 1750, and U.C.C§2-314.**

Dear Sir or Madame:

**PLEASE TAKE NOTICE** that we believe Nestle USA, Inc. (hereinafter "NESTLE") are in violation of the California Consumer Legal Remedies Act, *Cal. Civil Code* § 1750, *et seq.* (the "CLRA") and U.C.C §2-314, for the reasons set forth below.

We represent California consumer Michael Santini who purchased NESTLE products from stores in and around San Francisco County and other neighboring counties located in Northern California.

You have participated in the marketing and sale of NESTLE products: 1) Nesquik and 2) Different sizes and variation of the Nesquik product (hereinafter the "Products") which claims to contain "NO ARTIFICAL FLAVORS OR COLORS." However, the Products  contain artificial and/or synthetic ingredients because it is processed with alkai.

Moreover, your representation that the Products contain "NO ARTIFICAL FLAVORS OR COLORS" is false and misleading. The Products are unfit to be sold as 'natural' products given the ingredients.

My client, Michael Santini purchased one or more of the NESTLE Products based on the understanding that it was natural in regard to its flavoring and coloring.  Had my client known the truth about NESTLE Products, he and the class would not have purchased the NESTLE Products.

Michael Santini is acting on behalf of a class defined as all persons in the United States who purchased NESTLE Products is also acting on behalf of a subclass of persons who purchased NESTLE Products in the State of California.

Santini v. Nestle USA, Inc., et al.
January 22, 2020
Page 2 of 3

My client and similarly situated persons paid for the NESTLE Products in reliance on NESTLE'S representations set forth in marketing materials and on product labels and is, therefore, an aggrieved customer.

The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), expressly prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  NESTLE violated § 1770(a)(5) insofar as the 'natural' related claims constitute characteristics, ingredients and/or benefits that the NESTLE Products do not have.

The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a) (7), expressly prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  NESTLE violated § 1770(a)(7) insofar as the NESTLE Products are represented the 'natural' related claims which constitutes a particular quality or grade, when in truth they contain artificial and/or synthetic ingredients.

The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(9), expressly prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Safeway violated § 1770(a)(9) insofar as the Products have been advertised as 'natural' but are not advertised or sold in a manner consistent with those claims.  Because NESTLE knows that the NESTLE Products contain artificial and/or synthetic ingredients, NESTLE intended not to the sell them as advertised, in violation of the CLRA.

The California Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(16), expressly prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."  NESTLE violated § 1770(a)(16) insofar as has represented that the Plaintiff and similarly situated consumers have been supplied with 'natural' products when they have not.

Michael Santini and others reasonably relied on the language advertised by NESTLE in promoting, marketing, labeling and selling the NESTLE Products as natural.

Michael Santini and others are, therefore, the victims of a planned pattern and scheme of misleading advertising regarding the advertising, promotion, and sale of goods that violates the CLRA.

NESTLE pattern and practice of violating the CLRA and falsely advertising constitute unfair business practices within the meaning of California Business and Professions Code § 17200 and false advertising pursuant to § 17500.  Furthermore, the aforementioned conduct constitutes a violation of Cal. Com. Code § 2313(1) and 2314 and the rules regarding express and implied warranties.

Santini v. Nestle USA, Inc., et al.
January 22, 2020
Page 3 of 3

**YOU HAVE THIRTY (30) DAYS** from the date on which this notice is served upon you to correct, repair, replace, or otherwise rectify the foregoing violations as to our client and all aggrieved consumers. Our client demands that NESTLE immediately cease the unlawful business practices described herein, disgorge the profits derived from its unlawful business practice and false advertising, and make restitution to our client and all similarly situated purchasers of the NESTLE Products, without limitation.

**FAILURE TO TAKE ACTION WITHIN 30 DAYS OF THE RECEIPT OF THIS NOTICE SHALL RESULT IN THE FILING OF A CIVIL LAWSUIT IN U.S. DISTRICT COURT** for damages, restitution and injunctive relief and all other appropriate relief on behalf of our client and all others similarly situated pursuant to *Cal. Civil Code* § 1780, *et seq.*, *Cal. Business and Prof. Code* §§ 17200 and 17500 and U.C.C. 2-314 for statutory damages, punitive damages, treble damages, and attorney fees and costs as authorized by law.

Any response hereto shall be provided in written format and shall be clear and understandable and mailed via certified mail to the following addresses:

REUBEN D. NATHAN
2901 W COAST HWY STE 200
NEWPORT BEACH, CA 92663

**NOTICE AND DEMAND TO PRESERVE EVIDENCE.** This letter also constitutes notice to NESTLE that it is not to destroy, conceal or alter in any manner whatsoever any evidence, documents, merchandise, information, paper or electronic data and/or other tangible items or property potentially discoverable in the above- referenced matter, including but not limited to documents that relate to NESTLE'S processes for advertising the NESTLE Products online, NESTLE'S process for creating marketing materials and product labels, and all documents that relate to NESTLE'S advertising practices regarding the NESTLE Products. In order to assure that NESTLE'S obligation to preserve documents and things will be met, please forward a copy of this letter to any and all persons and entities with custodial responsibilities for the items referred to herein and other relevant evidence.

We look forward to your written response. If you fail to adequately redress the matters set forth herein within thirty (30) days, be advised that we will seek damages on a class-wide basis. To cure these defects, we demand that you make full restitution to all purchasers of NESTLE Products of all money obtained from sales thereof.

Kind Regards,

*/s/ Reuben D. Nathan*
REUBEN D. NATHAN